## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. _____

TENDRIL NETWORKS, INC.,

               Plaintiff,

v.

MARISSA HUMMON, and
JESS MELANSON

               Defendants.

---

## COMPLAINT FOR INJUNCTIVE RELIEF

---

Plaintiff Tendril Networks, Inc. ("Tendril"), for its Complaint for Injunctive Relief ("Complaint") against Marissa Hummon ("Dr. Hummon") and Jess Melanson ("Melanson") states as follows:

## INTRODUCTION

1.     Tendril requires the assistance of this Court to protect its business operations and trade secrets.  Dr. Hummon and Melanson are highly paid former Tendril employees who have retained substantial amounts of Tendril's confidential and trade secret information for the expressly admitted purpose of misappropriating and using such information to compete directly with Tendril in violation of trade secret laws and their agreements with Tendril.  Indeed, to this end, Dr. Hummon and Melanson engaged in a nearly year-long scheme with Josh Brumberger ("Brumberger"), the Chief Executive Officer of Utilidata, Inc. ("Utilidata"), whose plan was to

hire Dr. Hummon and Melanson to help Utilidata expand its existing technology to compete with Tendril.

## PARTIES, JURISDICTION, AND VENUE

2.      Tendril is a Delaware corporation with its principal place of business at 2580 55th Street, Suite 100, Boulder, CO 80301.

3.      Dr. Hummon is an individual who resides in Golden, Colorado.

4.      Melanson is an individual who resides in Montclair, New Jersey.

5.      The Court has original jurisdiction over this matter under 28 U.S.C. § 1331, as this action alleges a claim arising under the laws of the United States.  The Court has supplemental jurisdiction over the state law claims alleged herein pursuant to 28 U.S.C. § 1367.

6.      Venue is proper in the District of Colorado pursuant to, *inter alia*, 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated in the District of Colorado.  In the alternative, if such section is not applicable, venue is proper pursuant to 28 U.S.C. § 1391(b)(3) because Dr. Hummon resides in the District of Colorado and is subject to the Court's jurisdiction with respect to this action.  This Court has personal jurisdiction over Melanson because Melanson has had sufficient minimum contacts with the State of Colorado and has consented to venue and personal jurisdiction in Colorado as more fully described in Paragraph 28 below.

## GENERAL ALLEGATIONS

**A.    Tendril's Business and Trade Secrets.**

7.    Tendril provides energy management data analytics and software to energy utilities.  Among other products and services, Tendril's business involves a home energy management software platform called Orchestrated Energy ("OE"), which allows utilities to analyze energy use and cost factors to reduce energy consumption without impacting the comfort of residential customers.  OE interacts with the households' smart thermostats and other devices to obtain energy usage data, which is then analyzed using Tendril's proprietary models and programs.  OE then creates an optimal energy load delivery schedule, which thereafter can adjust in real time in response to day-to-day variations.

8.    Tendril has invested substantial effort, time, and money in developing and maintaining its confidential information and trade secrets.  This includes, without limitation, proprietary technology, including unique algorithms and optimization methodology for which Tendril holds patent protection. To protect and preserve its confidential information and trade secrets, Tendril uses firewalls, antivirus software, intrusion protection and detection systems, encryption mechanisms and other physical safeguards.  All Tendril systems are only accessible while on the Tendril private network.  Each Tendril user is given rights and roles that allow the user to access only systems that are appropriate for his or her work; for instance, no one but developers and technical support staff can access Tendril's source code repositories, and only the appropriate employees (finance & HR) can access legal and financial systems and data.  Tendril keeps all source code in private and secure source code repositories that automatically log and audit all source code check-ins and creates automatic versions with each update.

9.     Tendril further protects its confidential information and trade secrets through the use of restrictive agreements and by initiating litigation, such as this lawsuit, when necessary.

10.     Tendril's confidential information and trade secrets provide it with a business advantage over competitors that do not have access to, or knowledge of, the confidential information or trade secrets.

**B.     Defendants Sign Confidentiality Agreements.**

11.     Dr. Hummon began working for Tendril on or about February 16, 2015 in the position of Senior Energy Scientist.  Dr. Hummon thereafter held the title of Director- Product- Demand Management.

12.     Dr. Hummon signed Tendril's Employee Confidentiality and Inventions Assignment Agreement (the "Confidentiality Agreement") on or about January 16, 2015.  *See* Exhibit A, attached hereto.

13.     Melanson began working for Tendril on or about November 2, 2015 in the position of Vice President of Business Development.

14.     Melanson signed a substantially similar version of the Confidentiality Agreement on or about October 9, 2015.  *See* Exhibit B.

15.     Section 5 of the Confidentiality Agreement ("Non-Competition Provision") provides, *inter alia*:

> . . . . I agree that during my employment with the Company whether full-time or part-time and for a period of one year after my last day of employment with the Company, I will not directly or indirectly engage in (whether as an employee, consultant, proprietor, partner, director or otherwise), or have any ownership interest, or participate in the financing, operation, management or

> control of, any person, firm, corporation or business that engages
> in a "Restricted Business" in a "Restricted Territory" . . . .

Exh. A, Sec. 5; Exh. B, Sec. 5.

16.    "Restricted Business" is defined in the Confidentiality Agreement as "the design,

development, marketing, or sales of an open, extensible, standards-based, end-to-end energy

management system that connects consumer devices (like thermostats) to utilities' back office

application(s), highly scalable server-based energy management engines, wireless networking

gateways and bridges, in-home energy displays and other in-home energy management devices

or any other products or services marketed, sold or under development by the Company at any

time during my employment with the Company."  Exh. A, Sec. 5(i); Exh. B, Sec. 5.2(ii).

17.    "Restricted Territory" is defined as "any state, county, or locality in the United

States in which the Company conducts business and any other country, city, state, jurisdiction, or

territory in which the Company does business."  *Id*.

18.    Dr. Hummon and Melanson each acknowledged and agreed that the time

limitation and geographic scope of the Non-Competition Provision are reasonable and necessary

for the protection of Tendril's confidential and proprietary information.  Exh. A, Sec. 5; Exh. B,

Sec. 5.1.

19.    Section 4 of the Confidentiality Agreement ("Non-Solicitation Provision")

provides, *inter alia*:

> . . . I agree that during my employment with the Company whether
> full-time or part-time and for a period of one year after my last day
> of employment with the Company, I will not (a) directly or
> indirectly solicit or induce any employee of the Company to
> terminate or negatively alter his or her relationship with the
> Company or (b) directly or indirectly solicit the business of any

- 5 -

> client or customer of the Company (other than on behalf of the
> Company) or (c) directly or indirectly induce any client [or]
> customer . . . to terminate or negatively alter his, her or its
> relationship with the Company.  I agree that the geographic scope
> of the non-solicitation should include the "Restricted
> Territory" . . . .

Exh. A, Sec. 4; Exh. B, Sec. 4.

20.     Pursuant to Section 1 of the Confidentiality Agreement ("Confidentiality

Provision"), Dr. Hummon and Melanson each agreed as follows:  "At all times during my

employment and thereafter, I will hold in confidence and will not disclose, use, lecture upon, or

publish any of Company's Confidential Information (defined below) except as such use is

required in connection with my work for the Company . . . ."  Exh. A, Sec. 1; Exh. B, Sec. 1.1.

21.     Dr. Hummon and Melanson each further agreed as follows:  "I hereby assign to

Company any rights I have or acquire in any and all Confidential Information and recognize that

all Confidential Information shall be the sole and exclusive property of Company and its

assigns."  *Id.*

22.     "Confidential Information" is defined as follows:

> any and all confidential knowledge, data or information related to
> Company's business or its actual or demonstrably anticipated
> research or development, including without limitation (a) trade
> secrets, inventions, ideas, processes, computer source and object
> code, data, formulae, programs, other works of authorship, know-
> how, improvements, discoveries, developments, designs, and
> techniques; (b) information regarding products, plans for research
> and development, marketing and business plans, budgets, financial
> statements, contracts, prices, suppliers, and customers; (c)
> information regarding the skills and compensation of Company's
> employees, contractors, and any other service providers of
> Company; and (d) the existence of any business discussions,
> negotiations, or agreements between Company and any third party.

Exh. A, Sec. 1; Exh. B, Sec. 1.2.

23.     The Confidentiality Provision also includes protection for third party information,

as follows:

> I understand, in addition, that Company has received and in the
> future will receive from third parties confidential or proprietary
> information ("Third Party Information"), subject to a duty on
> Company's part to maintain the confidentiality of such information
> and to use it only for certain limited purposes.  During the term of
> my employment and thereafter, I will hold Third Party Information
> in strict confidence and will not disclose to anyone (other than
> Company personnel who need to know such information in
> connection with their work for Company) or use, except in
> connection with my work for Company, Third Party Information,
> unless expressly authorized by an officer of Company in writing.

Exh. A, Sec. 1; Exh. B, Sec. 1.3.

24.     In Section 2 of the Confidentiality Agreement ("Inventions Provision"),

Dr. Hummon and Melanson each agreed as follows:

> I hereby assign and agree to assign in the future (when any such
> Inventions or Proprietary Rights are first reduced to practice or
> first fixed in a tangible medium, as applicable) to Company all of
> my right, title, and interest in and to any and all Inventions (and all
> Proprietary Rights with respect thereto) made, conceived, reduced
> to practice, or learned by me, either alone or with others, during
> the period of my employment Company.

Exh. A, Sec. 2; Exh. B, Sec. 2.3.

25.     "Inventions" is defined as "any ideas, concepts, information, materials, processes,

data, programs, know-how, improvements, discoveries, developments, designs, artwork,

formulae, other copyrightable works, and techniques and all Proprietary Rights therein."  Exh. A,

Sec. 2; Exh. B, Sec. 2.1.  "Proprietary Rights" is defined as "all trade secrets, copyrights,

trademarks, mask work rights, patents and other intellectual property rights recognized by the laws of any jurisdiction or country." *Id*.

26.     In Section 6 of the Confidentiality Agreement, Dr. Hummon and Melanson each agreed as follows:

> Upon termination of my employment . . . I will deliver to Company all of Company's property, equipment and documents, together with all copies thereof, and any other material containing or disclosing any Inventions, Third Party Information or Confidential Information of Company and certify in writing that I have fully complied with the foregoing obligation.

27.     Dr. Hummon and Melanson each further acknowledged as follows:

> I acknowledge that, because my services are personal and unique and because I will have access to the Confidential Information of Company, any breach of this Agreement by me would cause irreparable injury to Company for which monetary damages would not be an adequate remedy and, therefore, will entitle Company to injunctive relief (including specific performance).

Exh. A, Sec. 8 (Injunctive Relief); Exh. B, Sec. 8.6.

28.     The Confidentiality Agreement provides that it "shall be governed, controlled, interpreted, and defined by and under the laws of the State of Colorado, without giving effect to any conflicts of laws principles that require the application of the law of a different state." Exh. A, Sec. 8 (Governing Law and Venue); Exh. B, Sec. 8.1.  Dr. Hummon and Melanson each agreed to "consent to the personal jurisdiction and venue in the state and federal courts for the county in which Company's principal place of business is located for any lawsuit filed there against me by Company arising from or related to this Agreement." *Id*.

29.     In her capacity as Senior Energy Scientist and, thereafter, Director- Product- Demand Management, Dr. Hummon reported directly to Melanson.  Dr. Hummon and Melanson

both worked directly on and with the proprietary technology underlying Tendril's OE services. Among other things, Dr. Hummon is a listed inventor on and was responsible for writing the patent(s) protecting Tendril's OE technology.  Dr. Hummon also worked directly with Tendril's major customers and business partners.

30.     As Vice President of Business Development, Melanson was responsible for leading product development at Tendril and also had significant access to Tendril's business information, strategies, and customer and business relationships.

31.     As a result of Dr. Hummon's and Melanson's employment with Tendril, they had knowledge of and access to Tendril's confidential information and trade secrets, including confidential information about Tendril's current and future products, features, performance characteristics, specifications, applications, materials and test results, plans for introduction of new products and product strategies, customers and prospects, including requirements, lists pricing, contacts and contracts, vendors, marketing partners, and other third party contracts, potential transactions, relationships and strategies.

**C.      Dr. Hummon and Melanson Notify Tendril of Their Resignations.**

32.     On or around August 17, 2018, Melanson informed Adrian Tuck ("Tuck"), Tendril's Chief Executive Officer, that Melanson intended to resign from Tendril to work for Utilidata.

33.     Utilidata also is in the business of providing energy optimization software platforms to utilities and large energy users, including in geographic areas in which Tendril does business.

34.     Melanson informed Tuck that Dr. Hummon also intended to resign to work for Utilidata, and that Melanson was responsible for introducing Dr. Hummon to Brumberger, the CEO of Utilidata.  Tendril would later learn that Melanson had been actively recruiting Dr. Hummon to leave Tendril for almost a year prior to their announced resignations.

35.     Over the next few days, Tuck had several additional conversations with Melanson and Dr. Hummon.  Melanson and Dr. Hummon acknowledged that they intended to move forward with a plan to form a separate entity to market Tendril's patented OE technology in the residential setting through non-utility sales channels – a plan that was part of Tendril's own confidential business roadmap for OE and that was actively being pursued with Tendril's business partners.

36.     Melanson stated that he and Dr. Hummon had discussed how Utilidata could "work around" the OE patents if Tendril did not license its technology to Utilidata.  Dr. Hummon also made statements indicating that she would use her knowledge of Tendril's confidential OE technology to "work around" Tendril's patent protection in order to compete with Tendril.

**D.     Tendril Discovers Dr. Hummon and Melanson's Year-Long Plan to Exploit Tendril's Technology for Their Own Purposes and Their Theft of Tendril Information.**

37.     Melanson previously had raised with Tuck the idea of Tendril creating a separate operating unit **within** Tendril to expand the market and sales of the OE platform.  Melanson had indicated to Tuck that Melanson wanted the opportunity to lead Tendril's OE business.

38.     After Melanson and Dr. Hummon notified Tendril of their intent to resign, Tendril discovered that Melanson, Dr. Hummon and Brumberger had been engaged in discussions for at

least a year regarding creating a separate business entity based on the OE technology, with or without the cooperation of Tendril.

39.     For example, on September 8, 2017, Melanson sent Brumberger and Dr. Hummon a detailed Word document outlining the steps to take in developing OE as a stand-alone company.  Melanson, Dr. Hummon and Brumberger all collaborated on refining the concept of establishing, marketing and fundraising for a business that was entirely based on Tendril's patented technology.  The business plan that was discussed with Brumberger, and ultimately formed the basis of presentations to Utilidata's existing investors, was based completely on Tendril's technology, internal confidential business plans, and product roadmaps.

40.     Melanson and Dr. Hummon acknowledged as early as October 2017 that they were divided in their loyalty and business focus between development of their new entity and their duties and responsibilities to their current employer, Tendril, discussing with one another their plan to "**split our time 50-50 between [T]endril and new ideas**."

41.     Melanson disclosed confidential information to Brumberger about Tendril's strategic business plans for OE, pending negotiations, and customers in order to strategize the best timing for implementing their plans.

42.     Melanson also disclosed other Tendril confidential information to Brumberger that was unrelated to OE, including highly confidential business plans that were the subject of separate non-disclosure agreements.  Specifically, Melanson informed Brumberger that Tendril was in discussions with several private equity firms regarding potential transactions/investments and disclosed to Brumberger a complete list of all of the firms involved.

43.     Dr. Hummon, Melanson and Brumberger met in person in Boston, Massachusetts in November 2017 to discuss their planned new business.  Upon information and belief, Dr. Hummon, Melanson and Brumberger further exchanged documents containing Tendril's intellectual property via their gmail accounts in preparation for the November face-to-face meeting and worked on additional materials containing Tendril intellectual property.

44.     Specifically, in a November 14, 2017 email, Melanson asked Brumberger for the personal email addresses of Utilidata's Director of Product Strategy and Director of Strategy and Partnership in order to send an outline of an investor pitch.  Melanson sent the email from his Tendril email account, and noted on the group message, that included other Utilidata employees, **"Great . . . also, I'm an idiot and didn't use my own gmail account!"**

45.     Dr. Hummon and Melanson continued to provide Brumberger with confidential information and regular updates about Tendril's ongoing business matters, including Tendril's meetings and negotiations, non-public information about business partners, potential transactions, potential new clients, customer-specific pricing strategies, customers, product information, and other Confidential Information as defined by the Confidentiality Agreement.

46.     For example, Melanson sent Brumberger a detailed document outlining a new pricing structure that Tendril intended to offer to one of its clients.

47.     Dr. Hummon and Melanson also provided Brumberger with information about Tendril's intellectual property, including disclosing the contents of Tendril's confidential attorney-client communications regarding its intellectual property.

48.     Tendril has discovered that, while still employed with Tendril, Dr. Hummon, and Melanson, with Brumberger, presented an investment proposal to Utilidata's largest investor,

Braemer Energy Ventures, regarding the expansion of Utilidata's business into residential demand management—i.e., the same type of market that OE serves.  This meeting occurred during an August 2-3 business trip for which Tendril paid the expenses of Dr. Hummon and Melanson.

49.     Upon information and belief, the material, including slide decks and other written documentation, that was shared with Utilidata employees and Utilidata investors as part of the August 2-3 pitch for investment contained information based on Tendril's own product roadmaps and other intellectual property and was centered on either using Tendril's patented OE technology or developing competing technology based on input from Melanson and Dr. Hummon.

50.     Upon information and belief, Brumberger presented information during the August 2-3 presentation and written materials that also contained information related to Tendril's current business partners and customers – information he learned only as a result of his relationship with Dr. Hummon and Melanson and their disclosure to him of Tendril's confidential information in direct violation of the Confidentiality Agreements.

51.     Melanson and Brumberger continued to work on their business plans through Melanson and Dr. Hummon's announced resignations. For example, Melanson went to Providence, Rhode Island, where Utilidata is headquartered, on August 8 to meet with Brumberger and other Utilidata employees in order to continue to work on the business plans.

52.     Dr. Hummon used her relationship with Tendril's key business partners and meetings held on behalf of Tendril to obtain information for the planned competing business and the pitch to the investor.  Indeed, Dr. Hummon strategized with Brumberger about her upcoming

meetings with a key Tendril business partner, telling him the questions she intended to ask regarding the integration of OE and the business partner's device, including timing of the business partner's technology and the business partner's views on competitors' plans. Dr. Hummon thereafter directly forwarded to Brumberger information from her contact, all obtained under the guise of the performance of her work for Tendril.

53.     Melanson and Dr. Hummon were well aware that their activities were indeed to be competitive to Tendril and that they were violating their obligations to Tendril.

54.     For example, as early as November 2017, Melanson acknowledged that their new venture would require "licensing OE, buying it, or building something different."

55.     Dr. Hummon told Melanson that she had thought about "alternative technology/IP" but "**I realized that I can't put any of that down on paper (or in an email) without muddling the waters around ownership of the IP**."

56.     After the August 2-3 pitch to investors, Dr. Hummon, Melanson, and Brumberger discussed concerns about Tendril business meetings intended to strengthen Tendril's relationships with a business partner that Dr. Hummon, Melanson, and Brumberger had intended to target and had pitched to their investors as part of their business proposal.

57.     Melanson told Dr. Hummon that he planned to lie to Tuck about how long Dr. Hummon had been involved in the discussions by falsely telling Tuck that Dr. Hummon had only become involved in the plans to start a competing business in the spring, 2018. Dr. Hummon agreed.  Melanson noted that the spring "**[f]eels like the least duplicitous timeframe**."

- 14 -

58.     In the two months before notifying Tendril of his intent to resign, Melanson accessed and downloaded to his personal email account numerous confidential Tendril files and documents, including confidential presentations containing detailed information about Tendril's business plans, customers and pipeline, financial information, analysis of its competitive position, technology, and other nonpublic information that would greatly assist a competitor to compete with Tendril.

59.     In summary, Dr. Hummon and Melanson, in concert with Brumberger, have taken Tendril's confidential information and technology, which took Tendril years of work and significant investment of time and money, to build an enterprise in a matter of months intended to directly compete with Tendril, all in breach of their contractual, fiduciary, and other legal obligations.

60.     Dr. Hummon and Melanson continue to retain Tendril's confidential information and trade secrets.  In addition, upon information and belief, Dr. Hummon and Melanson deleted ichat communications and other information related to their new business entity prior to the termination of their employment in an effort to cover their tracks.

## FIRST CLAIM FOR RELIEF
### (Breach of Contract)

61.     The preceding allegations of the Complaint are incorporated by reference as though set forth fully herein.

62.     Dr. Hummon and Melanson each entered into the Confidentiality Agreement with Tendril as set forth above.

63.     The Confidentiality Agreement is valid and enforceable.

64. Tendril has fully performed its obligations under the Confidentiality Agreement.

65. Dr. Hummon's and Melanson's actions, as set forth above, constitute actual and threatened breaches of the Confidentiality Agreement, including the Non-Competition, Non-Solicitation, and Confidentiality Provisions therein.

66. Tendril has no adequate remedy at law for Dr. Hummon's and Melanson's actions, and such actions have caused and will cause Tendril real, immediate, and irreparable injury, entitling Tendril to preliminary and permanent injunctive relief.

## SECOND CLAIM FOR RELIEF
### (Misappropriation of Trade Secrets Under 18 U.S.C. § 1836(b))

67. The preceding allegations of the Complaint are incorporated by reference as though set forth fully herein.

68. Dr. Hummon and Melanson have misappropriated and are threatening to misappropriate the trade secrets of Tendril, within the meaning of 18 U.S.C. § 1839(3), and as described above.

69. Dr. Hummon's and Melanson's actual and threatened misappropriation of trade secrets has caused and will cause Tendril real, immediate, and irreparable injury.

70. Tendril has no adequate remedy at law to prevent misappropriation, disclosure, or use of its trade secrets, and is entitled to preliminary and permanent injunctive relief pursuant to 18 U.S.C. § 1836(b)(3)(A).

## THIRD CLAIM FOR RELIEF
### (Misappropriation of Trade Secrets Under the Colorado Uniform Trade Secrets Act)

71.     The preceding allegations of the Complaint are incorporated by reference as though set forth fully herein.

72.     Dr. Hummon and Melanson have misappropriated and are threatening to misappropriate the trade secrets of Tendril as described above and within the meaning of Colo. Rev. Stat. § 7-74-102(4).

73.     Dr. Hummon's and Melanson's actual and threatened misappropriation of trade secrets has caused and will cause Tendril real, immediate, and irreparable injury.

74.     Tendril has no adequate remedy at law to prevent misappropriation, disclosure, or use of its trade secrets, and is entitled to preliminary and permanent injunctive relief pursuant to Colo. Rev. Stat. § 7-74-102(4).

## FOURTH CLAIM FOR RELIEF
### (Conversion)

75.     The preceding allegations of the Complaint are incorporated by reference as though set forth fully herein.

76.     Dr. Hummon and Melanson have intentionally taken Tendril's confidential information and trade secrets, including documents and data containing such information, without authorization.  Dr. Hummon and Melanson converted this information for their own use. Such actions are inconsistent with Tendril's rights.

77.     By their actions of retaining, using, and disclosing Tendril's confidential information and trade secrets, Dr. Hummon and Melanson have interfered with and deprived Tendril of the ability to exercise control over its property.

78.     By their actions of retaining, using, and disclosing Tendril's confidential information and trade secrets, Dr. Hummon and Melanson have converted Tendril's property.

79.     Tendril has no adequate remedy at law for Dr. Hummon's and Melanson's actions, and such actions have caused and will cause Tendril real, immediate, and irreparable injury, entitling Tendril to preliminary and permanent injunctive relief.

## FIFTH CLAIM FOR RELIEF
### (Civil Theft)

80.     The preceding allegations of the Complaint are incorporated by reference as though set forth fully herein.

81.     Dr. Hummon and Melanson knowingly obtained or exercised control over Tendril's property, including its Confidential Information and documents, without authorization.

82.     Dr. Hummon and Melanson intended to deprive Tendril of the use and benefit of its property.

83.     Tendril has no adequate remedy at law for Dr. Hummon's and Melanson's actions, and such actions have caused and will cause Tendril real, immediate, and irreparable injury, entitling Tendril to preliminary and permanent injunctive relief.

## SIXTH CLAIM FOR RELIEF
### (Breach of Duty of Loyalty)

84.     The preceding allegations of the Complaint are incorporated by reference as though set forth fully herein.

85.     As employees and agents of Tendril, Dr. Hummon and Melanson had a duty of loyalty to Tendril.

86.     Dr. Hummon and Melanson breached their duty of loyalty to Tendril.

87.     As a proximate result of Dr. Hummon's and Melanson's actions, Tendril has incurred damages in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, Tendril respectfully requests that the Court enter judgment in its favor and grant relief as follows:

A.     A preliminary and permanent injunction against Dr. Hummon and Melanson prohibiting them from using, communicating, disclosing, or in any way sharing with any person or business Tendril's confidential, proprietary, or trade secret information, including information defined as "Confidential Information" in the Confidentiality Agreement, as set forth above;

B.     A preliminary and permanent injunction against Dr. Hummon and Melanson prohibiting them, for twelve (12) months following the termination of their employment with Tendril, from directly or indirectly, alone or as a partner, member, officer, director, shareholder, adviser, agent, consultant, employee, or otherwise, engaging in the Restricted Business in the Restricted Territory, as set forth in the Confidentiality Agreement;

C.     A preliminary and permanent injunction against Dr. Hummon and Melanson prohibiting them, for the twelve (12) months following the termination of their employment with Tendril, from directly or indirectly, in the Restricted Territory, alone or as a partner, member, officer, director, shareholder, adviser, agent, consultant, employee, or otherwise (a) directly or indirectly soliciting or inducing any employee of Tendril to terminate or negatively alter his or her relationship with Tendril or (b) directly or indirectly soliciting the business of any client or customer of Tendril or (c) directly or indirectly inducing any client [or] customer . . . to terminate or negatively alter his, her or its relationship with Tendril;

- 19 -

D.      A preliminary and permanent injunction requiring Dr. Hummon and Melanson (a) to return to Tendril all confidential, proprietary, and/or trade secret information and property obtained from Tendril, including all computer files, documents, notes, records, reports, and other papers (and all copies thereof) relating to Tendril's business and all associated property that Dr. Hummon and Melanson may possess or have under their control and (b) to preserve, in their original state, all documents and information in Dr. Hummon's and Melanson's possession, custody, or control, or otherwise available to Dr. Hummon and Melanson, related to the issues set forth in this Complaint, which includes, but is not limited to, hard copy or electronic files of documents, computer files, hard drive data, ambient data, electronic mail messages, voice messages, instant messages, correspondence, and phone logs;

E.      An award of costs and attorneys' fees; and

F.      Such other and further relief as the Court may deem proper and just.

Dated:   September 24, 2018

Respectfully submitted,

*/s/ Brett C. Painter*　　　　　　　　　
Brett C. Painter
Nathalie A. Bleuzé
DAVIS GRAHAM & STUBBS LLP
1550 17th Street, Suite 500
Denver, CO 80202
Telephone: 303-892-9400
Facsimile: 303-893-1379
Email: brett.painter@dgslaw.com
Email: nathalie.bleuze@dgslaw.com

Amy Hartman
HARTMAN EMPLOYMENT LAW PRACTICE LLC
1035 Pearl Street, Suite 400
Boulder, CO 80302
Telephone: (303) 531-0930
Facsimile: (303) 625- 1030
E-Mail: amy@hartmanhrlaw.com

*Attorneys for Tendril Networks, Inc.*

Name and Address of Plaintiff:

Tendril Networks, Inc.
2580 55th Street, Suite 100
Boulder, CO 80301