**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 18-cv-02435-RM-NRN

TENDRIL NETWORKS, INC.,

      Plaintiff,

v.

MARISSA HUMMON, and
JESS MELANSON

      Defendants.

---

## DEFENDANTS' OPPOSITION TO TENDRIL'S
## MOTION FOR PRELIMINARY INJUCTION

---

## INTRODUCTION

Tendril's Motion for Preliminary Injunction (the "Motion") is either the result of fundamental misunderstanding of Defendant's business plans or a transparent effort to deflect from the departure of two highly-accomplished former employees. Notwithstanding Tendril's CEO's full knowledge of Defendants' plan to form a standalone, noncompetitive business to pursue residential demand management in non-utility markets – a plan that Defendants have since abandoned – Tendril's CEO's focus was squarely on the optics of Defendants' departures and how to avoid negative impact on various fundraising efforts. This, and not any actual threat to Tendril's business, is the motivation behind the Motion. However, given Defendants' abandonment of their plan to pursue residential demand management in any capacity for the duration of their noncompete, Tendril's purpose in pursuing this Motion should be seen for what it is: a vindictive effort to punish Defendants for leaving Tendril, rather than legitimate effort to preserve the status quo.

## FACTS

**A.     The Demand Management Industry and the Various Business Models**

Operation of the electrical system requires that energy supply and demand are kept in balance at all times. For over a century, the energy industry managed this balance by building and expanding energy *supply*, *e.g.*, natural gas plants and coal plants. In the last few decades, however, new technologies have emerged allowing the energy industry to manage energy *demand* in an effort to maintain this balance. Like energy supply, managing energy demand is a broad and diverse industry with hundreds of companies addressing different markets, marketing different technologies, and applying various market strategies.

Tendril is an energy demand management company.  Its residential demand management customers are exclusively regulated utilities. To the Defendants' knowledge, Tendril has no clear plans to access the non-utility residential demand market.

Accordingly, the Defendants set out to pursue a non-competitive part of the demand management market: selling residential demand management to *non-utilities*, which (as discussed below), Tendril's CEO, Adrian Tuck, encouraged.  However, in response to Tendril's recent about face and professed opposition to Defendants' plans, the Defendants have completely abandoned those plans and informed Tendril of the same.

Instead, the Defendants are now focusing on growing the business of their new employer, Utilidata, Inc. – which is not in the demand management space at all. Rather, Utilidata helps utilities optimize voltage. Unlike Tendril's business model, which assists utilities to accesses and control customer devices inside the home (not any utility-owned assets), Utilidata's business is limited to, and does not extend beyond, utility-owned assets.

In sum, the electric meter (provided and owned by the utility) serves as a dividing line between the market in which Utilidata operates and the market in which Tendril operates;

Utilidata manages utility assets, up to and including the meter, while Tendril operates on the customer side of the meter and does not directly manage any utility capital assets.

**B.      Defendants' Professional Experience and the Development of Orchestrated Energy**

*Dr. Marissa Hummon*:  Marissa Hummon has her doctorate in the field of Applied Physics. Prior to working at Tendril, Dr. Hummon worked at the National Renewable Energy Laboratory, managing a team of scientists in the fields of demand response, storage, and distributed solar. In 2015, she accepted the position of "senior energy scientist" at Tendril.

During her first year at Tendril, Dr. Hummon helped invent Orchestrated Energy ("OE"), patent-pending software to optimize demand essentially by controlling and re-programming residential smart thermostats to maintain customer comfort while driving energy efficiency and demand reduction. (OE is one of dozens of different types of residential demand management software technologies on the market.)

Although Dr. Hummon was repeatedly held out by Tendril as the "face" of OE, she received little respect with Tendril executives. Indeed, she was frequently marginalized and often asked to leave the room during discussions of business deals and partnerships. And despite requesting a larger role on the business side of OE, she was told that she "was just a scientist."

At the same time, she was harassed in an ongoing and consistent manner by two members of Tendril's product development team. Although she reported the bullying and demeaning behavior to management, she was told "to figure out how to work with these guys or find a new job." As a consequence, in early 2017, Hummon elected to work almost entirely from home. Dr. Hummon also filed a sexual harassment complaint against an executive, which Tendril failed to handle to her satisfaction, and she continued to suffer ongoing denigration and humiliation.[1]

---

[1] Dr. Hummon has since filed a complaint against Tendril for discrimination with the Equal Employment Opportunity Commission.

Relatedly, although Tendril's CTO (Jake Meier) routinely relied on Dr. Hummon for in-depth product knowledge, he consistently presented her ideas as his own. In the spring of 2017, when Hummon disagreed with Meier on a product decision, he yelled at her in front of a group of about 20 Tendril employees and told her that it was his "fucking" decision and she should accept it or move on.

Her situation improved marginally in August 2017, when Jess Melanson succeeded in obtaining a promotion for her to Director of Product for Demand Management, which came with a modest pay increase. However, on multiple occasions, Dr. Hummon told Tuck that she wanted to align her duties with her job title and pay, *i.e.*, she wanted an executive position. Tuck repeatedly, told Hummon that he could not give her such a promotion and (most recently, in July) encouraged her to leave if she could find such a position sooner than he could provide one.

***Jess Melanson*:** Mr. Melanson spent seven years as one of the lead state officials for energy policy in the State of New Jersey. He served as the principal energy advisor for two governors, in which capacity he helped create statewide policy changes related to investment in energy efficiency, renewable energy, and emerging energy technologies. Melanson also spent nearly eight years as an executive at PSEG, New Jersey's largest utility and energy company. Among his roles at PSEG, Melanson managed the company's regulated energy efficiency, demand management, and new energy technology business. In this capacity, Melanson ran PSEG's small business and residential demand management program, and evaluated technologies like Utilidata's voltage optimization solution.

In 2015, Melanson accepted a position at Tendril as an individual contributor reporting to the Senior Vice President of Sales and Marketing. In November 2016, Melanson took a new role as "Vice President of Solutions Marketing" and led a team of three direct reports, including,

beginning in early 2017, Dr. Hummon. Melanson reported to Tendril's Chief Operating Officer, Chris Black. In June 2017, Melanson's role was expanded to include the product group.

For over a year prior to their terminations from Tendril, Melanson frequently tried to obtain better recognition and working conditions for Dr. Hummon. During that time, Melanson recommended Hummon for raises and promotions and personally advocated for her in front of executives that seemed unwilling to acknowledge her worth. Nevertheless, while Hummon frequently confided in Melanson about her desire to leave Tendril, Mr. Melanson worked hard to keep Dr. Hummon at Tendril by trying to improve her compensation and title and attempting to insulate her from crass executives who routinely upset her.

## C.    Defendants' Business Plans Developed with Tuck's Knowledge and Consent

In 2017, Mr. Melanson and Dr. Hummon came to believe that OE would thrive as a stand-alone business, separate from Tendril's other line of business, which is focused on selling customer engagement tools to utilities. As Tendril acknowledges in its Complaint, Melanson proposed this business strategy to Tuck. (Complaint, ¶ 37.) Indeed, the September 8, 2017 proposal, outlining why OE should be part of a standalone entity – which the Complaint now identifies as a "secret" business plan – was prepared by Melanson and presented to Tuck. (Mot. at 10.) Notably, the idea was to form a new company (not a business unit within Tendril) was developed in part to more easily explore the non-utility markets. In his proposal, Melanson explicitly recommended Josh Brumberger (Utilidata's now-CEO and a long-time friend with whom Melanson had explored myriad business ideas since before joining Tendril) and Dr. Hummon for executive positions in the new entity. During discussions with Tuck, Tuck said that he understood the merits, but indicated that he likely could not pursue the idea.

In or around October 2017, knowing that Dr. Hummon was unhappy at Tendril and

looking to leave the company, Melanson shared that he was working with a friend (Brumberger) on a wide range of business ideas. The three discussed many ideas in the energy space, including the potential to form a new company that would pursue residential demand management in a manner different from Tendril, specifically pursuing non-utility markets. When Melanson, Hummon, and Brumberger began to hone in on this idea as their preferred business plan, Melanson scheduled a meeting with Tuck on February 21, 2018, to discuss his plan.

At that meeting, Melanson told Tuck that he was exploring ideas with Brumberger to raise money to start a new business and they had settled on the idea of residential demand management for non-utility markets, such as direct to consumers. Tuck said it would be very difficult to build a demand management business without utilities, but approved the pursuit of the idea and encouraged Melanson to set himself a deadline to complete the business proposal because the competing priorities of his job would make it difficult otherwise. Melanson and Tuck further discussed whether such a business would develop its own IP or possibly license the OE technology, and the potential that the business could partner with Tendril. Instructively, Tuck offered to review the business plan and provide feedback. Equally instructive, Tuck never once suggested that there was any impropriety with Melanson's plan or that it would somehow violate Melanson's confidentiality or noncompete agreements.

After a flurry of work on a business plan, work for Tendril did indeed begin to crowd out work on the business plan. Specifically, Tuck had decided that his new strategy would be to spin off OE as a stand-alone business and have Melanson lead that business, just as Melanson had originally proposed to Tuck in September 2017. However, in the summer of 2018, Tuck's plan shifted again, this time from spinning off the OE business to recapitalizing the existing business with a focus on utility growth. Melanson advised against this plan, stating that he did not believe

the growth goals were achievable and had reservations about working on the plan. In July 2018, Brumberger told Melanson that he believed Utilidata's current funder might be interested in funding an expansion of Utilidata's business into non-utility residential demand management.

## D. Defendants' Resignations

On August 17, 2018, prior to finalizing new employment (and with no more than a verbal comitment from Braemar to fund their idea), Melanson informed Tuck of his and Dr. Hummon's plan to leave Tendril to pursue the plan Tuck had approved on February 21, 2018, to sell residential demand management to non-utilities. Melanson wanted to alert Tuck even before new employment was secured for the benefit of Tendril, so that the company had more time to plan for Melanson and Hummon's departure. Tuck's reaction to this news, and the hours of conversations with Hummon and Melanson over the following days, were not at all focused on Hummon or Melanson "competing" with Tendril, but exclusively on the impact of losing two valued employees during his efforts to recapitalize the business. To that end, Tuck attempted to persuade Melanson and Hummon to delay their departures, even proposing that they stay into 2019 for Tendril's benefit. Indeed, on Saturday August 18, with full knowledge of Defendants' plan to sell residential demand management to non-utilities at Utilidata, Tuck offered Melanson an elevated role at Tendril, a large equity payout, and the potential that Tuck could raise money to fund Melanson, Hummon, and Brumberger's business idea to pursue residential demand management for non-utility markets in 2019, after the recapitalization was complete.

Thus, with full knowledge of the business Defendants intended to pursue, Tuck focused on how Defendants could *delay* their business idea, not that the idea was competitive with Tendril, would violate Defendants' contractual agreements, or would constitute misappropriation or theft of Tendril property. However, on August 21, Tuck suddenly reversed course, terminated

Melanson and purported to "accept" Dr. Hummon's resignation. Upon learning of Tendril's about-face on these matters, Defendants offered to not pursue their residential demand management strategy during the term of their noncompete. Accordingly, they have accepted positions at Utilidata that will in no way compete with Tendril or rely upon Tendril's information – proprietary or not. Moreover, as Defendants have repeatedly advised Tendril, to the extent that they are in possession of any information that Tendril deems confidential, they stand ready to return it.

**E.      Defendants' Confidentiality Agreements**

In connection with their employment, Tendril required Defendants to sign (substantially similar) confidentiality agreements (the "Confidentiality Agreements"). *See* Ex. A and B.

Paragraph 5 states:

> I agree that during my employment with the Company whether full-time or part-time and for a period of one year after my last day of employment with the Company, I will not directly or indirectly engage in (whether as an employee, consultant, proprietor, partner, director or otherwise), or have any ownership interest, or participate in the financing, operation, management or control of, any person, firm, corporation or business that engages in a "Restricted Business" in a "Restricted Territory" . . . .

"Restricted Business" is defined (unclearly) in the agreement. Ex. A, Sec. 5(i); Ex. B, Sec. 5.2(ii). "Restricted Territory" includes anywhere Tendril does business. *Id.*

Section 1 of the Confidentiality Agreement ("Confidentiality Provision"), provides, "At all times during my employment and thereafter, I will hold in confidence and will not disclose, use, lecture upon, or publish any of Company's Confidential Information (defined below) except as such use is required in connection with my work for the Company . . . ." Ex. A, Sec. 1; Ex. B, Sec. 1.1. "Confidential Information" is defined as "any and all confidential knowledge, data or information related to Company's business or its actual or demonstrably anticipated research or

development . . . ." Ex. A, Sec. 1; Ex. B, Sec. 1.2.

Section 4 of the Confidentiality Agreement ("Non-Solicitation Provision") prohibits Defendants from soliciting employees and customers. Ex. A, Sec. 4; Ex. B, Sec. 4.

## ARGUMENT

## <u>TENDRIL IS NOT ENTITLED TO A PRELIMINARY INUNJCTION</u>

A preliminary injunction is an extraordinary remedy; the right to relief must be clear and unequivocal. *GTE Corp. v. Williams,* 731 F.2d 676, 678 (10th Cir.1984); *DigitalGlobe, Inc. v. Paladino*, 269 F. Supp. 3d 1112, 1118 (D. Colo. 2017). To prevail, a movant must show: (1) a threat of irreparable harm if the injunction is not granted; (2) the threatened injury outweighs the harm caused to the defendants as a result of the injunction; (3) the injunction is not adverse to the public interest; and (4) a substantial likelihood of success on the merits of the case. *Dominion Video Satellite, Inc. v. Echostar Satellite Corp.,* 356 F.3d 1256, 1260 (10th Cir. 2004).

## A.     **No Irreparable Harm Where No Damages and Where Any Harm Is Self-Inflicted**

The Tenth Circuit has held that "[b]ecause a showing of probable irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction, the moving party must first demonstrate that such injury is likely before the other requirements for the issuance of an injunction will be considered." *Dominion Video Satellite, Inc. v. Echostar Satellite Corp.,* 356 F.3d 1256, 1260 (10th Cir. 2004) (quoting *Reuters Ltd. v. United Press Int'l, Inc.*, 903 F.2d 904, 907 (2d Cir.1990)). Irreparable harm is "not an easy burden to fulfill." *First Western Capital Mgmt. Co. v. Malamed*, 874 F.3d 1136, 1141 (10th Cir. 2017) (quoting *Greater Yellowstone Coal v. Flowers*, 321 F.3d 1250, 1258 (10th Cir. 2003)). "'To constitute irreparable harm, an injury must be certain, great, actual and not theoretical.'" *Makeen Invest. Group, LLC v. State of Colorado*, No. 17-CV-2759-RM-STV, 2018 WL 1256510, at *3 (D. Colo. Mar. 12, 2018)

(quoting *Schrier v. Univ. of Colo.*, 427 F.3d 1253, 1267 (10th Cir. 2005)). Further, a lynchpin of the irreparable harm inquiry is whether a movant can show that there is a significant risk that he will experience harm that cannot be compensated by monetary damages. *DigitalGlobe, Inc.,* 269 F. Supp. 3d at 1131 (D. Colo. 2017) (citing *RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1210 (10th Cir. 2009)).

Here, Tendril cannot demonstrate any threat of irreparable harm, as Defendants have already agreed (1) to not pursue residential energy demand management in any capacity during the term of their purported noncompetes and (2) to not use or disclose any of Tendril's trade secrets – ever. True to their word, they have been employed by Utilidata since September 26, and are not pursuing residential energy demand management or using or disclosing Tendril's alleged trade secrets (or other Confidential Information). Moreover, to the extent that Defendants are in possession of any information Tendril deems confidential, Defendants have already offered to return such information to Tendril and permanently delete it. Thus, there is no injury – much less "certain and great" injury – to Tendril by Defendants' employment at Utilidata, a corporation that has co-existed with Tendril for years without ever competing with it.

Tendril relies on case law suggesting that irreparable harm is presumed when a defendant possesses trade secrets. *See* Mot. at 26, citing *Port-a-Pour, Inc. v. Peak Innovations, Inc.,* 49 F. Supp. 3d 841, 872 (D. Colo. 2014). Setting aside whether any actual trade secrets are in fact at issue, this theory of presumed harm is no longer good law. As the Tenth Circuit recently explained in *First Western Capital*, "[c]ourts may presume irreparable harm only when a party is seeking an injunction under a statute that *mandates* injunctive relief as a remedy for a violation of the statute." 874 F.3d at 1140 (emphasis in original). "When, by contrast, a statute merely *authorizes* injunctive relief, courts may not presume irreparable harm, as doing so would be

'contrary to traditional equitable principles.'" *Id*. (citation omitted) (emphasis in original). *See also*, *DigitalGlobe,* 269 F. Supp. 3d at 1130 (court may not presume irreparable harm simply because the case involves a noncompete covenant, trade secrets, or the like). Here, the only statutes arguably at issue in this matter are the Defend Trade Secrets Act, 18 U.S.C. § 1836(b), and the Colorado Uniform Trade Secrets Act, Colo. Rev. Stat. § 7-74-103, both of which *authorize*, but do not *mandate*, injunctive relief as a remedy. Accordingly, Tendril is required to establish irreparable harm as one of the four elements necessary to prevail on its Motion.

Although Tendril also argues that damages would be impossible to ascertain (*see* Mot. at 26), even assuming Defendants were to create a business to sell to residential consumers – which they have already agreed not to do and are in fact not doing – the calculation of damages would be straightforward, *i.e.*, the value of any contracts obtained using protected or secret information. *See DigitalGlobe,* at 1131 (plaintiffs failed to show irreparable harm because they could calculate damages based on the value of the contract awarded to defendant's employer).

Further, a party cannot satisfy the irreparable harm requirement if the harm complained of is self-inflicted. *See Salt Lake Tribune Pub. Co., LLC v. AT & T Corp.,* 320 F.3d 1081, 1106 (10th Cir. 2003) (declining to consider self-inflicted harm to be irreparable); *Fiba Leasing Co. v. Airdyne Indus., Inc.*, 826 F. Supp. 38, 39 (D. Mass. 1993) ("A preliminary injunction movant does not satisfy the irreparable harm criterion when the alleged harm is self-inflicted"); *Caplan v. Fellheimer Eichen Braverman & Kaskey*, 68 F.3d 828, 839 (3d Cir. 1995) (outcome movant found unacceptable was not irreparable injury where movant acted to permit it). Here, Tuck's knowledge of Defendants' desire to pursue residential demand management is undeniable. Indeed, Defendants' primary goal was to pursue this strategy within Tendril. When Tendril rejected these plans, Tuck indicated a willingness to partner with Defendants' proposed new

business and even possibly help fund the business himself. Consequently, even if Defendants were continuing to pursue the plan of selling demand management through a new entity – which they are not – any harm resulting from this course of action would be self-inflicted. *Cf. Salt Lake Tribune Pub. Co., LLC v. AT & T Corp.,* 320 F.3d at 1106.

**B.      Threatened Injury to Tendril Does Not Outweigh Harm to Defendants**

Even if Tendril were somehow able to prove some actual irreparable injury, such marginal harm would pale in comparison to the harm inflicted on Defendants by the issuance of an injunction. In particular, Defendants would be prevented from earning a living in the field in which they have decades of experience, the vast majority of which pre-dates Tendril. Enjoining noncompetitive employment at Utilidata is akin to preventing Defendants from working at all. *See Crocker v. Greater Colorado Anesthesia*, P.C., 2018 COA 33, ¶¶ 21-22 (noncompete would impose undue hardship on defendant where defendant would need to move or pay damages in order to practice his profession); *Phoenix Capital, Inc. v. Dowell*, 176 P.3d 835, 844 (Colo. App. 2007) (in keeping with policy behind invalidating noncompetes, former employees have a right to make a living as long as employee does not use the employer's trade secrets to do so).

**C.      An Injunction Would Adversely Impact the Public Interest**

Defendants have dedicated their careers to advancing the field of renewable energy, energy efficiency, and combatting global warming. Permitting an unreasonably broad interpretation of the Confidentiality Agreements, or accepting Tendril's expansive interpretation of "trade secrets," unreasonably hinders Defendants' ability to pursue these laudable goals. *Backcountry Against Dumps v. Perry*, No. 3:12-CV-03062-L-JLB, 2017 WL 3712487, at *5 (S.D. Cal. Aug. 29, 2017) (denying preliminary injunction reasoning that "the generation of clean renewable energy is of substantial importance to the public interest is beyond dispute").

**D.** **Tendril Does Not Have a Likelihood of Success on the Merits**

Tendril brings claims for breach of Defendants' contractual covenants as well as misappropriation of trade secrets, conversion, and civil theft.[2] Tendril is unlikely to prevail on any of these claims.[3]

### 1. *Tendril's Breach of Contract Claims Fails*

Covenants not to compete are presumptively invalid under Colorado law. *See* § Colo. Rev. Stat. § 8-2-113. Thus, Tendril's noncompetition clause "is facially void" unless it meets one of the exceptions set forth in § 8-2-113. *Harvey Barnett, Inc. v. Shidler*, 143 F. Supp. 2d 1247, 1253 (D. Colo. 2001) (citing *Management Recruiters of Boulder. Inc. v. Miller,* 762 P.2d 763, 765 (1988)). Tendril contends that two exceptions are applicable here: "[a]ny contract for the protection of trade secrets," §8–2–113(2)(b); and "[e]xecutive and management personnel" §8–2–113(2)(d). Tendril has the burden of establishing that Defendants' noncompete covenants fall within one of these exceptions, which are to be narrowly construed. *DigitalGlobe, Inc.*, 269 F. Supp. 3d at 1120.

#### a. *The Trade Secrets Exception Does Not Apply*.

For a noncompete covenant to fit within the trade secret exception to the general rule of invalidity, the purpose of the covenant must be the protection of trade secrets. *Harvey Barnett, Inc.,* 143 F. Supp. 2d at 1253. Thus, as a threshold matter, any information Tendril seeks to

---

[2] Tendril's breach of fiduciary duty claim is not part of its Motion.

[3] Until recently, the Tenth Circuit endorsed an alternate standard that relaxed the likelihood of success requirement when the other three factors tipped strongly in the movant's favor. *DigitalGlobe, Inc. v. Paladino*, 269 F. Supp. 3d 1112, 1119 (D. Colo. 2017) (citing *Oklahoma ex rel. Okla. Tax Comm'n v. Int'l Registration Plan, Inc.*, 455 F.3d 1107, 1113 (10th Cir. 2006)). The Tenth Circuit recently abrogated this standard, announcing that "any modified test which relaxes one of the prongs for preliminary relief and thus deviates from the standard test is impermissible." *DigitalGlobe, Inc,* 269 F. Supp. 3d at 1119 (citing *Diné Citizens Against Ruining Our Environment v. Jewell*, 839 F.3d 1276, 1282 (10th Cir. 2016)).

protect with its noncompete must be a bona fide trade secret. *See id.* ("Of course, any information [plaintiff] wished to protect under this section must be a *bona fide* trade secret").

The Defendants' noncompetes prohibit them from engaging in a "Restricted Business" in a "Restricted Territory" for a term of one year. See Ex. A, Sec. 5; Ex. B Sec. 5. The definition of "Restricted Business" is "the design, development, marketing, or sales of an open, extensible, standards-based, end-to-end energy management system that connects consumer devices (like thermostats) to utilities' back office application(s), highly scalable server-based energy management engines, wireless networking gateways and bridges, in-home energy displays and other in-home energy management devices or any other products or services marketed, sold or under development by the Company at any time during my employment with the Company." *Id.*

While the meaning of this provision is far from clear, it notably fails to mention any intent to protect trade secrets. *See id.* Indeed, although Section 5 makes passing reference to protecting the Company's "Propriety Information," this term is not defined anywhere within the Confidentiality Agreement. Ex. A, Sec. 5; Ex. B, Sec. 5. The Confidentiality Agreement contains separate confidentiality provisions designed to protect Tendril's confidential information, including any trade secrets, which adequately protect such interests. *See* Ex. A, Sec. 1. The noncompete provision, however, is not limited to enhancing this protection or even directed to it.

In *Colorado Accounting Machines, Inc. v. Mergenthaler*, 44 Colo. App. 155 (1980), the court considered plaintiff's appeal of the invalidation of a noncompete. *Id*. at 155. In affirming the lower court's holding that the trade secrets exception did not apply, the Court of Appeals explained that the parties' contract contained a separate nondisclosure provision, which adequately protected plaintiff's interest in their trade secrets. *See id.* at 156. It determined that the noncompete was not limited to enhancing that protection but, rather, the "sole purpose behind the

restrictive covenant [was] to prohibit all competition." *Id.*

Here, the impact of the purported noncompete is even broader, applying well beyond actual competitors. Ex. A, Sec. 5, Ex. B, Sec. 5. Consequently, because the noncompete is not tailored to protect trade secrets, this exception to the general rule prohibiting noncompetes is unavailable to Tendril. *See id.; Harvey Barnett, Inc.*, 143 F. Supp. 2d at 1253 (holding that because the disclosed information is unlikely to constitute a protectable trade secret, the exception to the Colorado statute prohibiting noncompetes was inapplicable).

      b.   *The Executive-Management Exception Does Not Apply*.

Once trade secrets are removed from the equation, the validity of Tendril's noncompete provision turns on the applicability of the "executive-management exception." *See* §8–2–113(2)(d). This exception saves an otherwise invalid noncompete in the event that the employee is an executive or manager "in charge" of a business and acts in an unsupervised capacity. *Reed Mill & Lumber Co. v. Jensen*, 165 P.3d 733, 738 (Colo. Ct. App. 2006). In making this determination, Colorado courts focus "on an employee's degree of skill, knowledge, or autonomy." *Porter Indus., Inc. v. Higgins*, 680 P.2d 1339, 1342 (Colo. App. 1984). In light of how Dr. Hummon was treated while at Tendril, it is ironic that she now finds herself on the receiving end of this classification. Indeed, try as she might, Dr. Hummon was never granted an executive or managerial position within the meaning of the exception. Nor was she "in charge" of Tendril's existing contracts or permitted to act in an unsupervised capacity. Indeed, her requests for promotions and increased responsibility were repeatedly denied. Far from being autonomous and unsupervised, she was marginalized, asked to leave the room during important decisions, and excluded from discussions about business deals and partnerships.

  On these facts, Tendril will be unable to avail itself of the executive-management

exception with respect to Dr. Hummon, making her noncompete provision void and unenforceable. *See, e.g., Wells Fargo Ins. Servs. USA, Inc. v. McQuate*, 276 F. Supp. 3d 1089, 1105 (D. Colo. 2016) (noncompete clause was void because it did not meet the executive-management exception even though employees had authority to delegate work on their accounts and had input on performance review).

Further, although Tendril argues that Dr. Hummon and Mr. Melanson fit within the executive and management personnel exception when they left Tendril's employment, even if correct, they indisputably did not fit that exception when they signed their agreements. Accordingly, those agreements are void. *See Phoenix Capital, Inc. v. Dowell*, 176 P.3d 835, 840 (Colo. App. 2007), citing Black's Law Dictionary 1568 (7th ed.1999) ("A covenant or provision that is void ab initio is '[n]ull from the beginning, as from the first moment when a contract is entered into.'")

> c.  *The Noncompete is Unreasonably Broad*.

Even assuming, *arguendo*, the applicability of either of Colorado's statutory exceptions to the general prohibition against noncompetes, the Court must still consider whether the specific terms of the noncompete are reasonable in their effect. *See Mgmt. Recruiters of Boulder*, 762 P.2d at 766 (the second step in determining whether a noncompetition covenant is subject to the trade secrets exception is to determine "the reasonableness of [its] effect"). The central concern is whether a restrictive provision is necessary to safeguard the plaintiff's business. *Energex Enterprises, Inc. v. Anthony Doors, Inc.*, 250 F. Supp. 2d 1278, 1283 (D. Colo. 2003) ("[t]o determine the reasonableness of a particular agreement, the trial court must first examine the circumstances of the contracting parties to determine whether a restrictive covenant is justified at all, and then examine the specific terms of the noncompetition clause to determine the

reasonableness of their effect").

Here, the clause is question is unreasonably broad. Indeed, while nominally a covenant not to compete, the definition of "Restricted Business" is not limited to employment with competitors or solicitation of customers. Instead, this restriction appears to extend to the entire field of demand management and beyond, to encompass any "server-based energy management engines," which could encompass everything from software that operates power plants to commercial building management systems. As such, the question of whether the noncompete is reasonably necessary to protect Tendril's business is easily answered: It is not. It is patently unreasonable for Tendril to prevent Defendants from being employed in a capacity that is in no way limited to protecting Tendril's business. *Crocker*, 2018 COA at ¶ 20 (quoting *Reed Mill*, 165 P.3d at 736 ("a covenant not to compete is enforceable only if it is reasonable, and [t]o be reasonable, ... it must not impose hardship on the promisor")). Accordingly, Tendril's claims under the noncompete provision fail because the clause is unreasonably broad.

d. *Tendril Has No Harm From The Alleged Breach of Noncompete*.

Whether Defendants' noncompetes meet either of the exceptions set forth in the Colorado Code is the beginning, not the end, of the inquiry. *DigitalGlobe, Inc.*, 269 F. Supp. 3d at 1125 (having concluded that the covenant is enforceable, the Court must determine whether Plaintiffs are likely to succeed in proving a *breach* of covenant). If enforceable, the Court must still determine whether Tendril is likely to succeed in proving a breach. The breach-of-contract elements in Colorado are: "(1) the existence of a contract; (2) performance by the plaintiff or some justification for nonperformance; (3) failure to perform the contract by the defendant; and (4) resulting damages to the plaintiff." *DigitalGlobe, Inc.*, 269 F. Supp. 3d at 1125.

Under these circumstances, even assuming, *arguendo*, that Tendril proves the first of

these three elements, it will be unable to prove damages, which is fatal to its claim. It is axiomatic that, where Defendants will not be competing with Tendril for customers or services, Tendril will suffer no loss from their employment at Utilidata. *See DigitalGlobe, Inc.*, 269 F. Supp. 3d at 1126 (denying preliminary injunction where former employer had not shown that it was likely to succeed in proving any damages).[4]

  e. *There Has Been Neither Breach of The Nondisclosure Nor Resultant Harm.*

  As discussed above, it is unlikely that any bona fide trade secrets are at issue in this matter, which is fatal to Tendril's nondisclosure claim. *See DigitalGlobe,* 269 F. Supp. 3d at 1130 (holding that plaintiff had not shown likelihood of success establishing breach of nondisclosure agreement prohibiting disclosure of confidential information where plaintiff had not demonstrated that any trade secrets were at risk). Nor will Tendril be able to show damages flowing from any potential breach of the nondisclosure clause. First, Defendants have agreed not to pursue residential demand management, removing any possible use of the allegedly confidential information. Moreover, Defendants have not accessed any, and repeatedly offered to return and delete any and all, information in their possession that Tendril deems confidential.

  f. *No Solicitation of Employees or Customers.*

  With regard to the nonsoliciation provisions, "there is no legal basis to enforce an agreement not to solicit customers where § 8–2–113(2) would invalidate an agreement not to compete." *Wells Fargo Ins. Servs. USA, Inc.,* 276 F. Supp. 3d at 1108 (quoting *Phoenix Capital*, 176 P.3d at 844). Thus, if the noncompetition clause is void, so too is the nonsolicitation

---

[4] The doctrine of unclean hands also applies to bar Tendril's claims. In Colorado, the clean hands maxim dictates that "one who has engaged in improper conduct regarding the subject matter of the cause of action may, as a result, lose entitlement to an equitable remedy." *Salzman v. Bachrach*, 996 P.2d 1263, 1269 (Colo. 2000) (The doctrine of unclean hands is the principle that where a plaintiff seeks equitable relief, it must show that its conduct has been fair, equitable, and honest as to the controversy at issue).

provision, at least with respect to customers. *See id.* at 1109. Moreover, to this day, Defendants have in fact not interfered with or even attempted to take away any of Tendril clients or partners. With regard to the alleged solicitation of employees, the Confidentiality Agreements provide that Defendants will not "directly or indirectly solicit or induce any employee of the Company to terminate or negatively alter his or her relationship with the company." Ex. A, Sec. 4; Ex. B, Sec. 4. Courts use a totality of the circumstances approach, giving effect to the plain meaning to the word "solicit," when determining its meaning. *See Atmel Corp. v. Vitesse Semiconductor Corp*, 30 P.3d 789, 793 (Colo. App. 2001) (reasoning that "solicit" implies "actively initiated contact").

In this instance, Dr. Hummon frequently reached out to Mr. Melanson for support dealing with her challenging work environment. Mr. Melanson served as a mentor and protector, striving to create better conditions for Dr. Hummon. His efforts, in fact, convinced Dr. Hummon to stay at Tendril far longer than she might have with a different supervisor. It was only with the knowledge that Dr. Hummon was looking for new opportunities that he discussed with her the potential to work together on new business ventures. These facts do not support actively initiated contact. *See Amtel*, 30 P.3d at 793.

### 2. *Tendril's Claims for Misappropriation of Trade Secrets Necessarily Fail*

Tendril claims that Defendants misappropriated Tendril's trade secrets under 18 U.S.C. § 1836, as well as the Colorado Uniform Trade Secrets Act. The state and federal statutes define "trade secrets" to include, *inter alia*, financial information, scientific or technical information, designs, processes, procedures, or formulas. Colo.Rev.Stat. § 7–74–102; 18 U.S.C. § 1839(3). Although Tendril has artfully drafted its claims to mirror this language, alleging that Defendants misappropriated "strategic business plans, financial information, technical information, nonpublic information relating to its intellectual property, and customer-specific pricing

strategies," the facts do not support these claims.

First, many of the documents apparently at issue are, in fact, personal in nature and include photos, family budgets, and other information personal in nature. Further, information related to OE's patent-pending technology is public and, therefore, cannot constitute a trade secret. _Hawg Tools, LLC v. Newsco Int'l Energy Servs., Inc_., 411 P.3d 1126, 1131, *as modified on denial of reh'g* (Jan. 12, 2017), *cert. denied*, No. 17SC90, 2017 WL 2772254 (Colo. June 26, 2017) (plaintiff's design was not a trade secret where it was not substantially distinguishable from designs that were publicly available). Moreover, with respect to the specific business documents Tendril claims were improperly disclosed by Defendants, Tendril will be unable to prove the elements of a misappropriation claim, namely, that the disclosures were *without express or implied consent*. *See* C.R.S. § 7–74–102(2); 18 U.S.C. § 1839(5).

In September 2017 when Melanson created the proposal for pursuing OE as a standalone entity, when he told Tuck in February 2018 of his intent to pursue non-utility residential demand management as part of a new business, and again when he announced his intent to resign and pursue that plan at Utilidata, Tuck's response constituted both express and implied consent, thereby eliminating any claim that the information was "misappropriated." *See* C.R.S. § 7–74–102(2); 18 U.S.C. § 1839(5).

### 3.   *Conversion and Civil Theft Claim Are Preempted*

Tendril claims that this same conduct constitutes conversion and civil theft. Conversion and theft, however, are merely a restatement of the same operative facts as Tendril's trade secret misappropriation claims. As such, they are preempted by the Colorado UTSA. *See Powell Prod., Inc. v. Marks*, 948 F. Supp. 1469, 1474 (D. Colo. 1996) (holding plaintiff's conversion claim is a good example of a claim that is, at least in part, preempted by the UTSA). Moreover, Tendril

cannot prevail on all of the elements of conversation claim, which includes showing that

Defendants have refused to return the property. *See Glenn Arms Assoc. v. Century Mortg. And*

*Invst. Corp.*, 680 P. 2d 1315, 1317 (Colo. App. 1984).

### III. CONCLUSION

For the reasons discussed above, the Court should deny Tendril's Motion for Preliminary

Injunction.

Dated:  October 12, 2018

/s/ Stephen B. Reed
Russell Beck
Stephen B. Reed
Stephen D. Riden
Laura M. Raisty
Hannah T. Joseph
BECK REED RIDEN LLP
155 Federal Street, Suite 1302
Boston, MA 02110
Telephone: (617) 500-8660
Email: rbeck@beckreed.com
Email: sreed@beckreed.com
Email: lraisty@beckreed.com
Email: hjoseph@beckreed.com

*Attorneys for Defendants Marissa Hummon*
*and Jess Melanson*

## CERTIFICATE OF SERVICE

I hereby certify that on October 12, 2018, I filed the foregoing document with the Clerk of Court using the CM/ECF system, which caused all counsel of record to receive electronic service.

*/s/ Stephen B. Reed*
Stephen B. Reed

*Attorney for Defendants Marissa Hummon and Jess Melanson*